IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **BRAEDEN M. WRIGHT,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:16-cv-615-KPJ |
| | § | |
| **DENISON INDEPENDENT SCHOOL DISTRICT, ET AL.,** | § | |
| | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Denison Independent School District ("DISD") and Charles Bollinger ("Bollinger"), Chad Rogers ("Rogers"), and Henry Scott's ("Scott"), in their official capacities, (collectively, the "DISD Defendants") Motion for Summary Judgment (the "DISD Motion") (Dkt. 74). Plaintiff Braeden M. Wright ("Plaintiff") filed a response (Dkt. 83), and the DISD Defendants filed a reply (Dkt. 88). Also before the Court is Defendants Bollinger, Rogers, and Scott's, in their individual capacities, (collectively, the "Individual Defendants") Motion for Summary Judgment (the "Individual Defendants' Motion") (Dkt. 75). Plaintiff filed a response (Dkt. 85), and the Individual Defendants filed a reply (Dkt. 89). Additionally, the DISD Defendants and the Individual Defendants (collectively, "Defendants") filed Objections to Plaintiff's Summary Judgment Evidence ("Defendants' Objections") (Dkt. 87), to which Plaintiff filed a response ((Dkt. 90).

This matter was referred to the undersigned for all proceedings, including the entry of judgment, in accordance with 28 U.S.C. Section 636(c) and the consent of the parties. *See* Dkt. 67. Having reviewed the DISD Motion (Dkt. 74) and the Individual Defendants' Motion (Dkt. 75), as well as the responses thereto, and all relevant filings, the Court finds the DISD Motion (Dkt. 74)

is **GRANTED**, and the Individual Defendants' Motion (Dkt. 75) is **GRANTED**. Additionally, the Court finds Defendants' Objections (Dkt. 87) are **OVERRULED**.

## I. BACKGROUND

Plaintiff's Third Amended Complaint (the "Complaint") (Dkt. 55), the operative complaint herein, asserts two claims under 42 U.S.C. § 1983 ("Section 1983"): (1) a *Monell* claim[1] against DISD (*see* Dkt. 55 at ¶ 44); and (2) a First Amendment retaliation claim against all Defendants (*Id*. at ¶¶ 58-60). The Complaint alleges that Plaintiff "faced bullying and suffered unfair penalties" by Defendants after he reported "inappropriate sexually-laced comments" and incidents of cheating he observed while he was a member of Denison High School's ("DHS") varsity baseball team. *See* Dkt. 55 at ¶¶ 21-26.

Defendant Bollinger is a baseball coach at DHS; Defendant Rogers is the DHS athletic director; and Defendant Scott is the DISD superintendent. The incidents recited in the Complaint arose during the 2015-2016 academic year. Plaintiff alleges that on February 27, 2016, Bollinger made inappropriate sexual comments about Plaintiff's mother and made sexual comments about Plaintiff's mother in front of others on several occasions. *Id*. at ¶¶ 19-21. Plaintiff also alleges that on March 22, 2016, Bollinger encouraged Plaintiff to cheat while playing baseball for DHS.[2] *Id*. at ¶¶ 22-25. Thereafter, Plaintiff, along with his parents, reported Bollinger's alleged sexual comments and cheating directives to Scott. *Id*. at ¶ 26. Plaintiff claims that after he and his parents reported Bollinger's allegedly inappropriate behavior to Scott, DISD failed to take any corrective action against Bollinger and that Bollinger retaliated against Plaintiff by benching Plaintiff

---

[1] Under *Monell*, a plaintiff seeking to impose liability on a municipality under Section 1983 is required to identify a municipal "policy" or "custom" that caused the plaintiff's injury. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).
[2] The cheating allegation arose from an incident on March 22, 2016, during which Bollinger allegedly approached Plaintiff with Vaseline on his fingers and instructed Plaintiff to put the Vaseline on his glove (the "Vaseline Incident"). *See* Dkt. 55 at ¶¶ 22-25.

"without cause or explanation" and announcing to other members of the team that Plaintiff would be benched. *Id.* at ¶¶ 28-29, 32-34.

According to the Complaint, after Plaintiff and his parents met several times with Rogers to discuss Bollinger's treatment of Plaintiff to no avail, Plaintiff's father ("Mr. Wright") sent an email to every member of the DISD school board on May 3, 2016, outlining the details of the alleged retaliation against Plaintiff. On May 10, 2016, Mr. Wright met with Scott and DISD assistant superintendent David Kirkbride[3] ("Kirkbride"). Plaintiff alleges that during this meeting, Scott told Plaintiff that if things didn't change, he would be kicked out of the baseball program for causing "this mess with the coach." *Id.* at ¶ 39. The Complaint further alleges that at the end-of-season athletics banquet, Plaintiff received no recognition for his performance as pitcher even though "[he] was the top performing pitcher on the team." *Id* at ¶ 41.

As noted above, Plaintiff asserts that the DISD Defendants are liable for alleged constitutional violations under *Monell* and that all Defendants are liable for alleged retaliation in violation of the First Amendment. *See generally* Dkt. 55. Plaintiff seeks damages, costs, and reasonable attorney's fees as a result of the alleged violations of his civil rights. *Id.*

## II. LEGAL STANDARD

Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999). The appropriate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

---

[3] On November 3, 2017, Kirkbride was dismissed from this lawsuit with prejudice pursuant to an agreed stipulation of dismissal. *See* Dkt. 72.

3

The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). In sustaining this burden, the movant must identify those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party, however, "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant's burden is only to point out the absence of evidence supporting the nonmoving party's case. *Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996).

In response, the nonmovant's motion "may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255-57). Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record to show that there is a genuine issue for trial. *Stults*, 76 F.3d at 655. The citations to evidence must be specific, as the district court is not required to "scour the record" to determine whether the evidence raises a genuine issue of material fact. E.D. TEX. LOCAL R. CV-56(d). Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the nonmovant's burden. *Stults*, 76 F.3d at 655. As the Supreme Court has recognized, "the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions. . . ." *Anderson*, 477 U.S. at 255.

## III. ANALYSIS

### A. OBJECTIONS TO PLAINTIFF'S SUMMARY JUDGMENT EVIDENCE

In Defendants' Objections, Defendants assert several objections to Plaintiff's summary judgment evidence (Dkt. 87), to which Plaintiff filed a response (Dkt. 90). The Court has made its own independent analysis of the evidence and relies on only relevant and admissible evidence pursuant to the Federal Rules of Civil Procedure and the Federal Rules of Evidence. Accordingly, the Objections (Dkt. 87) are **OVERRULED**.

### B. FIRST AMENDMENT RETALIATON

The DISD Defendants, as well as the Individual Defendants, argue that Plaintiff's First Amendment retaliation claim fails because Plaintiff has not suffered an actionable constitutional harm. *See generally* Dkts. 74, 75. Thus, the Court will first address whether Plaintiff has established an actionable constitutional violation. Plaintiff asserts a violation of his rights under the First Amendment. Claims under Section 1983 require that a plaintiff was "deprived of a right or interest secured by the Constitution and the laws of the United States" and "that the deprivation occurred under color of state law." *Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1406 (5th Cir. 1995) (citing *West v. Atkins*, 487 U.S. 42, 28 (1988)).

The First Amendment protects not only direct government action limiting free speech, but also protects against retaliatory government action meant to inhibit free speech because if the government could achieve through indirect means what it could not achieve through direct action, the government could stymie free speech. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). When the plaintiff is not a government employee or otherwise contractually involved with government actors, he must satisfy the elements of an "ordinary citizen" claim: (1) he was engaged in a constitutionally protected activity; (2) the defendants' actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and

(3) the defendants' adverse actions were substantially motivated against the plaintiff's exercise of constitutionally protected conduct. *Culbertson v. Lykos*, 790 F.3d 608, 618 (5th Cir. 2015). Thus, a plaintiff must be able to show that his exercise of free speech was, in some way, curtailed. *Keenan*, 290 F.3d at 259. Furthermore, there must be a causal connection between the allegedly retaliatory conduct and Plaintiff's alleged injury. *Cripps v. La. Dep't of Agric. & Forestry*, 819 F.3d 221, 229 (5th Cir. 2016).

When the allegations are made in the context of a school setting, the plaintiff's First Amendment rights must be interpreted "in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988). Even in the school environment, however, not all allegedly retaliatory conduct will give rise to an actionable First Amendment claim; rather, "some retaliatory actions—even if they actually have the effect of chilling the plaintiff's speech—are too trivial or minor to be actionable as a violation of the First Amendment." *Keenan*, 290 F.3d at 258. Thus, the Court analyzes Plaintiff's First Amendment retaliation claim with respect to the actions of the Individual Defendants under the framework of the special characteristics of the school environment.

1. **<u>Alleged Retaliatory Conduct by Bollinger</u>**

Plaintiff primarily alleges that Bollinger retaliated against him by not playing him at first base and not talking to him. *See* Dkts. 75 at 15; 78-9 at 15. The Individual Defendants posit that these "trivial slights" arising from "coaching decisions and interactions between coaches and players" do not give rise to an actionable First Amendment retaliation claim. Dkt. 75 at 16 (citing *Dorsett v. Bd. of Trustees for State Colleges & Universities*, 940 F.2d 121, 123-24 (5th Cir. 1991)). The Individual Defendants reason that just as there is no room for federal courts to "micromanage" disputes over "teaching assignments, room assignments, administrative duties, classroom equipment, teacher recognition, and a host of other relatively trivial matters," neither should

6

federal courts micromanage playing time, coaching decisions, and interactions between players and coaches in a high school extracurricular sports program. Dkt. 75 at 16 (quoting *Dorsett*, 940 F.2d at 123-24). The Court agrees. If education and faculty appointments are ill suited for federal court supervision, disputes involving playing time, coaching decisions, and interactions between players and coaches at the high school level are even less suited. Furthermore, "the established policy and precedent of this circuit" cautions against micromanagement of such matters. *Miller v. Bunce*, 220 F.3d 584 (5th Cir. 2000) (citing *Dorsett*, 940 F.2d at 123-24).

Plaintiff's arguments in opposition to the Individual Defendants' Motion for Summary Judgment are insufficient to overcome Fifth Circuit policy and precedent regarding claims of retaliation in the school environment. Plaintiff contends that Bollinger's actions are beyond trivial because Bollinger had a position of authority, and as such, was in a position to wield substantial power over Plaintiff's future. *See* Dkt. 85 at 23. Citing *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 771 (9th Cir. 2006), Plaintiff suggests that a coach's actions similar to Coach Bollinger's actions here are sufficient to chill the speech of an ordinary athlete. *See id*. As an initial matter, the Court finds *Pinard* neither binding on, nor persuasive to, this Court. More importantly, however, *Pinard* is factually dissimilar from the present case.

The first distinguishing factor is that the boys' basketball coach in *Pinard* was found to be verbally abusive and highly intimidating to the entire team, eventually resulting in a petition signed by all but one of the players (the coach's son) calling for the coach to resign. *See Pinard*, 467 F.3d at 760-61. Second, while the *Pinard* court found that the players' petition and complaints against their coach were protected speech, their refusal to board the bus to attend an away game—even if assumed to be expressive conduct—was properly punishable as unprotected speech because it substantially disrupted and materially interfered with the operation of the basketball program. *Id*. at 772. The final distinguishing factor is that the players in *Pinard* who chose not to board the bus

7

were permanently suspended from the team. *Id*. at 761-62. Based on the foregoing, *Pinard* is inapposite to the instant case. Here, the allegations involve only one player, Plaintiff; there are no allegations of verbal abuse or intimidation; and Plaintiff was never suspended from the team.

Additionally, Plaintiff's allegation that Bollinger stopped talking to him is not supported by the evidence in the record. Bollinger testified that he and his assistant tried to talk to Plaintiff but Plaintiff "isolated himself" doing "his own thing in practice." Dkt. 78-11 at 2-3. Bollinger further testified that he gave Plaintiff positive feedback in front of the team. *Id*. Evidence of Plaintiff isolating himself from the team is corroborated by Scott. *See* Dkt. 78-3 at 2 (describing Plaintiff's behavior as noncompliant based on Plaintiff's refusal to lift weights with the team; taking direction from his privately hired trainer instead of from Bollinger; leaving practice early; and sitting in the dugout when the team was taking batting practice). Plaintiff failed to submit any evidence to contradict Bollinger and Scott's characterization of Bollinger's efforts to communicate with Plaintiff. Moreover, the Court finds that Plaintiff's allegations of retaliation, even if true, are at most, trivial matters common to interactions between coaches and players— especially as it relates to disagreement with coaching decisions—and therefore, as a matter of law, do not give rise to an actionable First Amendment retaliation claim. *See Dorsett*, 940 F.2d at 123-24.

Plaintiff also alleges that Bollinger retaliated against him because Plaintiff did not play first base following the Vaseline Incident on March 22, 2016. *Id*.; *see also* Dkt. 78-9 at 15. Bollinger, however, asserts he made this decision prior to any report about the Vaseline Incident. *See* Dkt. 78-2 at 2. Furthermore, there is evidence establishing there were games prior to March 22, 2016, where Plaintiff did not play first base. *See* Dkt. 78-1 at 35-42, 47-48, 59-60. The evidence also established that Plaintiff pitched in six of the remaining twelve games following the Vaseline Incident on March 22, 2016 (*see id*. at 61-88). And although the Individual Defendants acknowledge that Plaintiff did not play first base after March 19, 2016, they attribute this to a

8

"strategic coaching decision." Dkts. 75 at 18; 78-2 at 89-90. The Individual Defendants also point out that Plaintiff was not the only member of the team that did not play in every game that season. *See* Dkts. 75 at 18; 78-1 at 25-88.

Plaintiff's belief—supported only by his own affidavit (Dkt. 84-1)—that he was "due, by pattern, to play first base on March 24, 2016, and to pitch again on March 29, 2016" (Dkt. 85 at 21-22) establishes only that Plaintiff disagreed with Bollinger's coaching decisions, *see Dorsett*, 940 F.2d at 123-24, not that Bollinger's actions were motivated by Plaintiff's reports about the Vaseline Incident. Plaintiff also concedes that he was the starting pitcher in the March 29, 2016, game and pitched in other games during the remainder of the season. Dkt. 85 at 22. Although Plaintiff argues that Bollinger "wielded power over [his] opportunities to play," he fails to establish that Bollinger's actions were due to anything other than strategic coaching decisions—decisions that Bollinger, as the coach, was entitled to make.

Adverse actions in a retaliation claim must be material, and not merely "petty indignities." *Colman v. Faucher*, 128 F. Supp. 3d 487, 500 (D.R.I. 2015) (citing *Ahern v. Shinseki*, 629 F.3d 49, 56 (1st Cir.2010) (internal citation omitted)). "While being shuffled around in a lineup and losing playing time is not petty to an athlete, it is a normal course of events during an athletic team's season, and not every unjust, unfair, or unpleasant experience is actionable." *Id*. (internal quotation marks omitted). Additionally, regardless of Plaintiff's belief that Bollinger's coaching decisions diminished his attractiveness to college scouts, this impact is entirely speculative. Plaintiff's claim fails to establish a causal relationship between any protected activities and the alleged retaliatory activity. Even assuming all of Plaintiff's claims about his baseball abilities and his potential collegiate scholarship opportunities were true, he has failed to submit evidence to establish that Bollinger's coaching decisions regarding Plaintiff were motivated by animus against Plaintiff and not by strategic considerations relating to the team as a whole. Thus, even if Plaintiff's

9

claims of retaliation give rise to an actionable First Amendment claim, Plaintiff cannot establish that these actions were substantially motivated by any protected activity. *See* Dkt. 75 at 17.

Plaintiff also alleges that Bollinger retaliated against Plaintiff "by denying him a pitching award and interfering with his transfer." Dkt. 89 at 24. Although the allegation about the pitching award is briefly mentioned in the Complaint (*see* Dkt. 55 at ¶ 41), there is no mention in the Complaint of any allegations of interference with Plaintiff's transfer. In any event, these allegations are not supported by any competent summary judgment evidence. Nothing in the record establishes that Plaintiff was entitled to a pitching award that was later rescinded in retaliation for his protected activity; nor is there evidence that Bollinger interfered with Plaintiff's transfer as Plaintiff alleges. *See* Dkt. 85 at 21-26. To the extent that Plaintiff attempts to argue that these actions, along with other "minor actions" by Bollinger (such as announcing to the team that Plaintiff would not be pitching), may "in the aggregate, rise [to] the level of a constructive adverse action sufficient to chill speech" (Dkt. 85 at 23-24), these arguments are, at best, speculative, and therefore, unpersuasive. As previously noted, there is no evidence of Plaintiff's entitlement to a pitching award, and Plaintiff's speculation that Bollinger's announcement that Plaintiff would not pitch was "perhaps an attempt to humiliate [him] or make an example out of him" (Dkt. 85 at 24) is not evidence of retaliation.

Plaintiff's temporal proximity arguments are likewise unpersuasive. *See* Dkt. 85 at 25-26. The cases Plaintiff cites in support of this position,[4] are all in the context of establishing a *prima facie* case of First Amendment retaliation in the employment context,[5] which is not the applicable

---

[4] Plaintiff cites *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1181 (5th Cir. 1997) (evaluating a Title VII employment claim) and *Evans v. City of Houston*, 245 F.3d 344, 347 (5th Cir. 2001) (evaluating a Title VII and ADEA claim).

[5] To prevail on a First Amendment retaliation claim in the employment context, a plaintiff must show: (1) he suffered an adverse employment action; (2) his speech involved a matter of public concern; (3) his interest in speaking outweighed the employer's interest in promoting efficiency in the workplace; and (4) the speech motivated the

test in this case, and also fails to consider the "special characteristics" of the school environment. *Hazelwood*, 484 U.S. at 266. The context here involves a dispute over coaching decisions. And, as previously discussed, involving the courts in the minutia of evaluating coaching decisions in the context of First Amendment retaliation claims is exactly the type of exercise the Fifth Circuit consciously avoided in *Dorsett*, and which case law makes clear are not actionable under the First Amendment. *See Dorsett*, 940 F.2d at 123-24; *Keenan*, 290 F.3d at 258.

Finally, Plaintiff has not established that his speech was curtailed as a result of Bollinger's alleged retaliatory actions since the record establishes that Plaintiff filed multiple grievances with DISD after the alleged retaliatory conduct. *See* Dkts. 78-1 at 2-3; 87-88; 78-6 at 1; 78-7 at 1-2; 78-8 at 1-2. For all the foregoing reasons, the Court finds that Plaintiff has not established that he suffered a constitutional violation as a result of Bollinger's actions.

### 2. Alleged Retaliatory Conduct by Scott and Rogers

For similar reasons, the Court finds that the retaliatory actions alleged by Plaintiff against Defendants Scott and Rogers do not establish the requisite constitutional harm. Plaintiff's retaliation allegation against Scott is that he participated in the retaliation by threatening to remove Plaintiff from the baseball team. *See* Dkt. 84-22 at 2. The Individual Defendants respond that even if true, "retaliatory threats are just hot air" that do not give rise to an actionable First Amendment retaliation claim. *See* Dkt. 75 at 19 (citing *Breaux v. City of Garland*, 205 F.3d 150, 159 (5th Cir. 2000)). While *Breaux* involved threats of termination in the employment context, the Individual Defendants argue that the principle applies equally in this context. *See* Dkt. at 19.

Although Scott admits that during the meeting on May 10, 2016 (the "May 10 Meeting"), he told Mr. Wright that if he had been the coach he would have removed Plaintiff from the team,

---

employer's adverse employment action. *Mooney v. Lafayette Cty. Sch. Dist.*, 538 F. App'x 447, 453 (5th Cir. 2013) (internal citations omitted).

Scott asserts his rationale was not for any retaliatory reason but, rather, because of Plaintiff's non-compliant behavior, such as refusing to lift weights with the team, following the direction of his privately hired trainer instead of taking direction from Bollinger, leaving practice early, and sitting in the dugout when the team was taking batting practice. *See* Dkts. 78-2 at 2; 78-3 at 2. Plaintiff presents no evidence to contradict Scott's characterization of his comments during the May 10 Meeting. Furthermore, Scott's characterization is corroborated by Kirkbride, who stated that during the May 10 Meeting, Scott expressed concerns regarding Plaintiff's non-compliance with Bollinger's direction and Plaintiff's general lack of cooperation with the team. *See* Dkts. 78-1 at 2; 84-22 at 2; 78-2 at 2; 78-3 at 2.

Scott's alleged threats notwithstanding, it is undisputed that Plaintiff was not removed from the team. *See* Dkt. 78-9 at 15-16. Furthermore, Plaintiff does not otherwise establish a causal connection between Plaintiff's complaints about Bollinger and Scott's allegedly retaliatory actions. Plaintiff argues that Scott's threat was more than "hot air" because Scott was "an authority figure who ha[d] the power to make [the threat] happen." Dkt. 85 at 26. However, Plaintiff fails to establish that Plaintiff's First Amendment rights were chilled as a result of Scott's alleged actions. Therefore, Plaintiff has not established the second prong of his First Amendment retaliation claim with respect to Defendant Scott.

It appears that Plaintiff's only allegation with respect to Defendant Rogers is that he is liable as Bollinger's supervisor for the alleged constitutional violation against Plaintiff. The Court notes that Plaintiff also attempts to hold Scott liable under a theory of supervisory liability. *See* Dkt. 85 at 27-30. However, for Defendants Scott and Rogers to be held liable for Bollinger's actions, Plaintiff must first establish that Bollinger's actions constituted an actionable constitutional harm. *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) ("A supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the

constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury."). Here, there are no allegations that Scott or Rogers participated in Bollinger's alleged retaliatory conduct. Furthermore, as set forth above, Plaintiff failed to establish an underlying actionable constitutional violation with respect to alleged retaliatory actions by Bollinger. Therefore, the Court need not proceed further as to Plaintiff's supervisory liability theory.

### 3. Alleged Retaliatory Conduct by DISD

Although Plaintiff separately alleges a retaliation claim and a municipal liability claim under Section 1983 against DISD, both claims turn on the same analysis. The Court must consider two separate issues: (1) whether the plaintiff's harm was caused by a constitutional violation, and if so, (2) whether the school district is responsible for that violation. *Collins v. City of Harker Heights*, 503 U.S. 115, 121-22 (1992). The second inquiry is of particular relevance here because municipalities (such as school districts) may not be held liable for constitutional violations solely based on the actions of their employees. *Id.* at 121 (citing *Monell*, 436 U.S. at 691). As the Supreme Court explained:

> [In *Monell*], the Court held that Congress intended municipalities and other local government entities to be included among those persons to whom § 1983 applies. At the same time, the Court made it clear that municipalities may not be held liable "unless action pursuant to official municipal policy of some nature caused a constitutional tort." The Court emphasized that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

*Id.* (internal citations and quotations omitted)

As an initial matter, the Court will dispose of Plaintiff's claims against Defendants Bollinger, Scott, and Rogers in their official capacities. As explained by the Supreme Court, official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (internal

citations omitted). Such suits are "to be treated as a suit against the entity." *Id*. Therefore, Plaintiff's claims against the Individual Defendants in their official capacities are redundant and fail as a matter of law because the real party in interest is DISD, not Defendants Bollinger, Scott, and Rogers. *See id*.

Although the Court has already determined that Plaintiff failed to establish a viable First Amendment retaliation claim with respect to the actions of Bollinger, Scott, and Rogers, the Court will, nevertheless, analyze whether Plaintiff can establish municipal liability, as required to maintain a constitutional claim against DISD under Section 1983. In order for a governmental entity to be liable under Section 1983, the plaintiff must establish: "1) a policymaker; 2) an official policy; 3) and a violation of constitutional rights whose 'moving force' is the policy or custom." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). The policymaker must be one with the authority to make final decisions regarding policy. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). In Texas, the only policymaker for a school district is the Board of Trustees. TEX. EDUC. CODE § 11.151(b); *Rivera*, 349 F.3d at 247. "'Policy' consists of a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 753 (5th Cir. 1993) (quoting *Monell*, 436 U.S. at 690). As explained below, the Court finds that Plaintiff has not met this requirement.

The Fifth Circuit has defined "official policy" as:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be

> attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 92 (5th Cir. 1992)

Plaintiff provides no evidence that the DISD Board of Trustees—DISD's final policymaker as a matter of law—officially adopted and promulgated, with deliberate indifference, any policy that was the moving force behind the alleged violation of Plaintiff's First Amendment right to be free from retaliation. *See Rivera*, 349 F.3d at 247 ("Texas law unequivocally delegates to the Board 'the exclusive power and duty to govern and oversee the management of the public schools of the district.'" (quoting TEX. EDUC. CODE §§ 11.151(b))). Therefore, in order to establish municipal liability, Plaintiff must rest his policy claim on a pattern, which "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge and that the objectionable conduct is the expected, accepted practice of [District] employees." *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017). Additionally, "[a] pattern requires similarity, specificity, and sufficiently numerous prior incidents." *Id*. Plaintiff has failed to make this showing.

With the exception of an incident involving another student that occurred after the events underlying the present lawsuit, Plaintiff relies primarily on incidents surrounding his own allegations of retaliation in an attempt to establish municipal liability through a widespread practice or custom. *See* Dkt. 83 at 23-29. However, Plaintiff's argument is entirely misplaced. As the Fifth Circuit has explained:

> A pattern is tantamount to official policy when it is so common and well-settled as to constitute a custom that fairly represents municipal policy. Where prior incidents are used to prove a pattern, they must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees. It is thus clear that a plaintiff must demonstrate a pattern of abuses that transcends the error made in a single case. A pattern requires similarity and specificity; [p]rior indications cannot simply be for any and all bad or unwise acts,

but rather must point to the specific violation in question. A pattern also requires sufficiently numerous prior incidents, as opposed to isolated instances.

*Peterson v. City of Fort Worth*, 588 F.3d 838, 850-51 (5th Cir. 2009) (internal citations and quotation marks omitted).

Plaintiff has provided no evidence of a past "pattern and practice of retaliation and failure to respond to employee misconduct" that would give rise to an actionable custom. Nor has Plaintiff provided evidence that the conduct in question "has become a traditional way of carrying out policy and has acquired the force of law." *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984). Indeed, while Plaintiff claims there are numerous instances of conduct establishing a pattern constituting a policy, all of the recited incidents relate to Plaintiff's complaints. *See* Dkt. 83 at 24-26. The Court finds this is insufficient to establish a pattern or custom giving rise to a policy for purpose of municipal liability. *See Peterson*, 588 F.3d at 850-51; *see also Piotrowski*, 237 F.3d at 581 ("Taken together, [the alleged policies] express no single municipal policy but only a series of adversarial conclusions by [the plaintiff] . . . relating to her individual case."). The alleged policies identified in *Piotrowski* are directly analogous to the present case. Plaintiff's attempt to aggregate isolated incidents in his own case to show a policy or pattern is contrary to Fifth Circuit precedent. Accordingly, the Court finds that DISD is entitled to summary judgment as a matter of law.

### 4. Qualified Immunity Defense

Even where an action exists under Section 1983, a government official may be protected by qualified immunity. "The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S.

335, 341 (1986). "Therefore, a plaintiff seeking to overcome qualified immunity must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (internal quotation marks omitted)). Courts may "exercise their sound discretion in deciding which of the two prongs should be addressed first in light of circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 226 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Qualified immunity is a high standard for Plaintiff to overcome as "[e]ven if the official's conduct violated a constitutional right, he is entitled to qualified immunity if the conduct was objectively reasonable." *Spann v. Rainey*, 987 F.2d 1110, 1114 (5th Cir. 1993).

The Court finds the Individual Defendants are entitled to qualified immunity because, as explained above, Plaintiff has failed to establish an actionable violation of his rights under the First Amendment. The Court has already concluded that the Individual Defendants' alleged retaliatory actions would not chill a person of ordinary firmness from continuing to engage in a protected activity. Not only that, but the record establishes that Plaintiff, in fact, did continue to engage in protected speech after the alleged retaliatory actions. Furthermore, Plaintiff failed to establish that the alleged retaliatory actions were substantially motivated by any protected activity. Moreover, as explained above, the alleged retaliatory actions (Bollinger's coaching decisions and his interactions with Plaintiff), even if true, were too trivial to support a First Amendment retaliation claim. While the Court understands that these actions were not petty to Plaintiff, it is the normal course of events in organized athletics that players (and their parents) will disagree with coaching decisions and believe they have been treated unfairly by such decisions. However, not every unfair or unpleasant experience is actionable. *Colman*, 128 F. Supp. 3d at 510. Accordingly, the Court finds the Fifth Circuit's rationale in *Dorsett* is applicable in the present case and concludes there

is no place here for this Court "to undertake to micromanage" high school athletics. *Dorsett*, 940 F.2d at 124. Because there is no constitutional violation, the Court finds the Individual Defendants are entitled to qualified immunity and need not consider the second step of the qualified immunity analysis.

### IV. <u>CONCLUSION</u>

Based on the foregoing, the DISD Defendants' Motion for Summary Judgment (Dkt. 74) and the Individual Defendants' Motion for Summary Judgment (Dkt. 75) are both **GRANTED**, and Plaintiff shall take nothing by his claims here.

**IT IS SO ORDERED**.

**SIGNED this 20th day of August, 2018.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE